IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-03358-WYD-MEH

MALIBU MEDIA, LLC,

    Plaintiff,

v.

JUSTIN WINKLER,

    Defendant.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

    Before the Court is Plaintiff's Motion for Summary Judgment [filed May 15, 2015; docket #50]. Pursuant to 28 U.S.C. § 636(b)(1)(B) and D.C. Colo. LCivR 72.1(c), the motion was referred to me for a Report and Recommendation. The matter is briefed to the extent permitted by court rules and the prevailing law and the Court finds oral argument will not assist in the adjudication of the motion. Based on the record herein and for the reasons that follow, the Court recommends that Plaintiff's motion be **granted in part and denied in part**.[1]

---

[1] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings of the Magistrate Judge that are accepted or adopted by the District Court. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *In re Garcia*, 347 F. App'x 381, 382-83 (10th Cir. 2009).

## BACKGROUND

In this case, Plaintiff's allegations involve a complicated technical process used to download copyrighted works (here, motion pictures) through the BitTorrent program; therefore, this Court finds it necessary first to explain how BitTorrent works, then to note its findings of fact in this case.

**I.     BitTorrent Protocol**

Several courts in this country have researched, defined and described the protocol in such a way that even technologically challenged individuals may understand the intricacies of the BitTorrent program. This Court finds particularly instructive and gratefully adopts the description provided by the Honorable Thomas L. Ludington, District Judge for the Eastern District of Michigan, in *Patrick Collins, Inc. v. John Does 1-28*, No. 12-13670, 2013 WL 359759 (E.D. Mich. Jan. 29, 2013), in which Judge Ludington first defines terms used with the protocol, then describes how BitTorrent operates. *Id.* at *1-*3. First, the vocabulary used in the technology:

> *Internet Protocol* (IP): The system of communication standards that ensures data packets transmitted over the internet reach their intended destinations.
>
> *IP Address:* The unique identifying number of a device connected to the internet.
>
> *Uniform Resource Locator* (URL): The internet address assigned to a web document or resource by which it can be accessed by all web browsers.
>
> *File:* A collection of related data packets treated as a unit.
>
> *Hash Identifier:* A 40-character alphanumeric string that forms a unique identifier of an encoded file.
>
> *Hypertext Transfer Protocol* (HTTP): A system of communication standards that websites use to communicate with web browsers.
>
> *BitTorrent:* A peer-to-peer file sharing protocol.
>
> *Peer:* A BitTorrent user.

> *Swarm:* A group of peers sharing a particular file (identified by its unique hash identifier). A swarm has two types of peers – "leechers" and "seeds." It bears reiterating: to constitute a swarm, all of the peers must be sharing the same file (identified by its unique hash identifier).
>
> *Initial Seeder:* A BitTorrent user who first takes a particular file (such as a movie), breaks it into pieces, encodes the pieces with hash identifiers, creates a torrent file with the data about that file and its tracker, and makes the complete file available to other BitTorrent users.
>
> *Seed:* A peer who downloaded a complete file and is uploading all of its pieces to other peers in the swarm.
>
> *Leecher:* A peer in the process of downloading the file from the other peers. As soon as a leecher downloads new content (a piece of the file), the leecher begins sharing its content with the other leechers in the swarm.
>
> *Piece*: A one-quarter megabyte size part of a file being shared via BitTorrent (except for the last, smaller piece, which is the size of the remainder of the file).
>
> *Tracker:* A server containing an updated list of peers in the swarm. It allows a peer to learn about other peers sharing a particular torrent and join the swarm.
>
> *Torrent file*: The hub of the BitTorrent system, a *torrent* file is a small file containing the file name, the IP address of the tracker, the number of and size of the pieces, and the hash identifier unique to the pieces of that particular torrent file.

*Patrick Collins, Inc.*, 2013 WL 359759, at *1-*2 (citations omitted). Judge Ludington proceeds to

describe the protocol and how BitTorrent works:

> BitTorrent, as noted, is a peer-to-peer file sharing protocol. More precisely, it is a peer-to-peer model that improves on prior generations of peer-to-peer networks by solving the "free-rider problem wherein a substantial majority of users downloaded but never uploaded content."
>
> . . .
>
> Briefly, here's how BitTorrent works. A file transfer begins "when one user accesses the Internet through an ISP and intentionally makes a digital file of a work available to the public from his or her computer. This file is referred to as the first 'seed.' Other users, who are referred to as 'peers,' then access the Internet and request the file. These users engage each other in a group, referred to as a 'swarm,' and begin downloading the seed file. As each peer receives portions of the seed, that peer

3

> makes those portions available to other peers in the swarm."
>
> Elaborating on the process, BitTorrent.org explains that to download a file, a peer performs six steps:
>
> 1. Install BitTorrent (or have done so already).
> 2. Surf the web.
> 3. Click on a link to a *.torrent* file.
> 4. Select where to save the file locally, or select a partial download to resume.
> 5. Wait for download to complete.
> 6. Tell downloader to exit (it keeps uploading until this happens).
>
> BitTorrent's key, as noted, is reciprocity – a peer not only downloads but automatically uploads pieces to other peers. "To keep the torrent operating at maximum capacity, the BitTorrent protocol uses a process called pipelining. Every active peer in a torrent maintains a continuously refreshed queue of requests for pieces, so that no connection is ever left idle after any one piece is downloaded."
>
> "In addition, the protocol has an internal mechanism that makes sure that those peers who are offering little or nothing to the torrent will get little or nothing from it."
>
> In sum, BitTorrent is a reciprocal, decentralized network – and a tough nut to crack for copyright holders:
>
> Data is not stored on a central server. Rather, a user downloads the file in discrete segments from many different users who send data directly to one another. While trackers coordinate and assist peers in locating a swarm, the tracker itself sends out very little data. This makes BitTorrent an extremely efficient mechanism for transferring large files and at the same time, it insulates the protocol itself from anti-piracy efforts because there are no central servers to enjoin from unlawfully distributing copyrighted content. Thus, when copyrighted data is transmitted via BitTorrent, the copyright holder is largely limited to holding the individual file sharers liable for infringement.

*Id.* at *2-*3 (citations omitted).

## II. Findings of Fact

The Court makes the following findings of fact viewed in the light most favorable to the Defendant, who is the non-moving party in this matter.

1.    Plaintiff Malibu Media, LLC is a limited liability company organized and existing under the

laws of the State of California.

2.     Defendant Justin Winkler is an individual residing at 117 West Byers Place, Apt 8, Denver, Colorado 80223.

3.     Plaintiff produces its own adult content films. Declaration of Colette Pelissier Field, May 18, 2015 ("Field Declaration"), ¶ 20, docket #50-1.

4.     Plaintiff owns the copyrights to the following films:

| Title | Registration Number | Date of First Publication | Registration Date |
| --- | --- | --- | --- |
| Almost Famous | PA0001864687 | 09/27/2013 | 09/30/2013 |
| Alone Is A Dream Left Behind | PA0001860984 | 08/24/2013 | 09/10/2013 |
| Apartment in Madrid | PA0001826992 | 02/16/2013 | 02/18/2013 |
| Baby Blues | PA0001867887 | 10/30/2013 | 11/03/2013 |
| Back to Bed | PA0001847656 | 06/08/2013 | 06/18/2013 |
| Black and White | PA0001831226 | 02/22/2013 | 03/07/2013 |
| Blindfold Me Part #2 | PA0001867890 | 11/03/2013 | 11/06/2013 |
| Body Language | PA0001868096 | 10/26/2013 | 11/01/2013 |
| Breakfast in Bed | PA0001787253 | 04/16/2012 | 04/17/2012 |
| Burning | PA0001860951 | 07/27/2013 | 08/26/2013 |
| Come from behind | PA0001863248 | 09/23/2013 | 09/26/2013 |
| Coucher Avec une Autre Fille | PA0001801715 | 08/13/2012 | 08/14/2012 |
| Dangerous Game | PA0001810505 | 10/10/2012 | 10/14/2012 |
| Date Night at Home | PA0001864689 | 09/29/2013 | 09/30/2013 |
| First and Forever | PA0001863112 | 09/21/2013 | 09/23/2013 |
| Green Eyes | PA0001843090 | 04/30/2013 | 05/14/2013 |
| Grow Up With Me | PA0001866185 | 10/17/2013 | 10/19/2013 |
| Her First Time | PA0001863046 | 09/18/2013 | 09/21/2013 |
| I Love James Deen | PA0001860982 | 08/20/2013 | 09/10/2013 |
| In Love with a Girl | PA0001866052 | 10/11/2013 | 10/16/2013 |
| Lovers at Home | PA0001868816 | 11/05/2013 | 11/10/2013 |
| Make Me Feel Beautiful | PA0001859651 | 07/25/2013 | 08/01/2013 |
| Meet Me in Madrid | PA0001847658 | 06/12/2013 | 06/30/2013 |
| My Naughty Girl | PA0001868094 | 10/28/2013 | 11/01/2013 |
| Oh Mia | PA0001852674 | 06/28/2013 | 07/05/2013 |
| Pretty Back Door Baby | PA0001789427 | 05/08/2012 | 05/10/2012 |
| Raw Passion | PA0001860979 | 08/18/2013 | 09/02/2013 |
| Red Satin | PA0001828892 | 03/06/2013 | 03/12/2013 |
| Simply Stunning | PA0001843103 | 05/03/2013 | 05/14/2013 |
| Sneaking In | PA0001860962 | 08/17/2013 | 09/08/2013 |
| Spontaneous | PA0001860977 | 08/22/2013 | 09/10/2013 |
| Stay for a While | PA0001859661 | 07/05/2013 | 08/02/2013 |
| The Young and the Restless | PA0001843111 | 05/05/2013 | 05/15/2013 |
| This Really Happened | PA0001860970 | 08/03/2013 | 09/01/2013 |
| Through the Looking Glass | PA0001851980 | 06/30/2013 | 07/05/2013 |
| Tuesday Morning | PA0001828897 | 02/26/2013 | 03/12/2013 |
| Up Close and Personal | PA0001859653 | 07/21/2013 | 08/01/2013 |

| Title | Registration Number | Date of First Publication | Registration Date |
|---|---|---|---|
| We Love Ourselves | PA0001860944 | 08/26/2013 | 09/08/2013 |
| Without Words | PA0001859650 | 07/17/2013 | 08/01/2013 |

Copyrights-In-Suit List, docket #12-2; Copyright Catalog, docket #50-3.

5.      Plaintiff releases films, like those listed above, for sale on its subscription-based website, www.X-Art.com. Field Declaration, ¶¶ 48-49.

6.      To fight against piracy, Plaintiff sends thousands of DMCA notices per month. *Id.*, ¶ 30. Plaintiff also includes copyright notices on many of its works, and affirmatively did so with respect to 28 of the films listed above. *See id.*, ¶ 50; *see also* Exhibit E attached to Field Declaration, docket ## 50-4, 50-5. Further, Plaintiff's website states that all of its works are copyrighted. Field Declaration, ¶ 51.

7.      Prior to this lawsuit, Plaintiff and Defendant were strangers. *Id.*, ¶ 52. Defendant did not request that Plaintiff create the films that Plaintiff alleges he copied. *Id.*, ¶ 53. Plaintiff did not deliver the above-listed films to Defendant, and Plaintiff never intended for Defendant to copy and distribute any of its films. *Id.*, ¶¶ 54-55.

8.      Plaintiff's investigator, IPP International UG ("IPP"), through Excipio GmbH ("Excipio"), established a connection with a computer using IP address 67.165.232.125 ("IP Address"). Declaration of Tobias Fieser, December 3, 2013 ("Fieser Declaration)," ¶ 13, docket #50-6; *see also* Declaration of Michael Patzer, May 14, 2015 ("Patzer Declaration"), ¶¶ 7; 15, docket #50-7.

9.      Mr. Patzer designed, implemented, maintains, and monitors the data collection system that Excipio both owns and uses to identify the internet protocol addresses used by people to copy films via the BitTorrent protocol. Excipio licenses this data collection system to IPP. Patzer Declaration, ¶¶ 6-7.

10. IPP, through Excipio, recorded the IP Address engage in 433 transactions or "hits" of Plaintiff's copyrighted movies between July 17, 2013 and January 3, 2014. *See* Excel Spreadsheet Containing MySQL Data, docket #50-7 at 8-15.

11. Each one of these transactions was recorded in a packet capture ("PCAP") computer file and on a "MySQL" server log file. Each entry on the MySQL log file correlates to a specific PCAP file in Excipio's possession. *Id.*; *see also* Patzer Declaration, ¶¶ 16-21.

12. PCAPs are recordings of the information exchanged between two computers. Each PCAP listed on the Excel Spreadsheet shows the IP Address sending a piece of a copy of one of Plaintiff's copyrighted movies to another internet protocol address belonging to the investigative servers. Patzer Declaration, ¶¶ 16, 20.

13. Each PCAP shows what was transmitted: a packet of data (a/k/a "piece" or "bit") that correlates by Cryptographic Hash Value to a piece of Plaintiff's copyrighted films. *See id.*; *see also* Feiser Declaration, ¶¶ 13-15.

14. Contemporaneously with their creation, the PCAPs are stored on a WORM ("Write Once Read Many") drive. Excipio uses these drives because it is impossible to modify or delete the data after it has been written to a WORM tape drive. Indeed, the WORM tape drive is not capable of being manipulated or altered. *Id.*, ¶ 23.

15. IPP then verified that the pieces of the computer files sent by the IP Address correlate (as evidenced by identical Cryptographic Hash Values) to copies of Plaintiff's films. *See* Feiser Declaration, ¶ 15.

16. IPP also viewed a control copy of each of the above-listed films; each film was viewed side-by-side with the corresponding digital media file identified by its hash value. IPP verified that

each digital media file contained a motion picture that was identical, strikingly similar or substantially similar to the films listed above. *Id.*, ¶ 16.

17. IPP's software also engaged in an expanded surveillance and logged the IP Address being used to distribute third party files through BitTorrent. This surveillance reflected that the user of the IP Address engaged in BitTorrent transactions associated with 1507 files between July 2012 and November 2013. *Id.*, ¶ 17; *see also* docket #50-7 at 16-44.

18. Defendant's Internet Service Provider ("ISP"), Comcast, identified the Defendant, Justin Winkler, as the subscriber assigned the IP Address on November 9, 2013, one day on which the copying of the films occurred. *See* Comcast Spreadsheet, docket #50-14.

19. At all times material to the allegations in this case, Defendant's wireless router was password protected. Defendant's Responses to Plaintiff's First Set of Interrogatories, No. 5, docket #50-16.

20. Defendant also received three copyright alert notices from Comcast notifying him that his Internet was being used to infringe copyrights. *Id.*, No. 11.

21. Defendant admitted to using peer-to-peer file sharing services to download content. *Id.*, No. 21.

22. Defendant verified in his discovery responses that he had only one hard drive or computer device in his possession: a Compaq Presario V6000. *Id.*, No. 4; *see also* Defendant's Responses to Plaintiff's Requests for Production, No. 1, docket #50-17.

23. Defendant produced his Compaq Presario V6000's hard drive for examination and, on it, Plaintiff's expert, Patrick Paige, found evidence that Plaintiff's X-Art Works once existed. Declaration of Patrick Paige, February 6, 2015 ("Paige Declaration"), ¶ 52, docket #50-9.

24. Paige conducted a key word search of the 84 X-Art filenames identified on Patzer's list of

BitTorrent transactions (docket #50-7 at 16-44). He found that 44 of the X-Art filenames identified on the list once existed on Defendant's computer. *Id.*, ¶ 50.

25. Next, Paige conducted a search of the torrent filenames for each of Plaintiff's above-listed films, as provided by Excipio. Paige found that, of Plaintiff's 39 films at issue in this case, at least 28 of the films once existed on Defendant's Compaq Presario. *Id.*, ¶ 52.

26. Paige also found evidence on Defendant's Compaq Presario that several X-Art titles were accessed on an "F" drive within a folder location "Video/XXX/." This folder is not located on Defendant's Compaq Presario; it is located on another hard drive or external device. *Id.* at ¶¶ 53-56. Yet, Defendant did not identify nor produce any hard drives other than his Compaq Presario. *See* Plaintiff's Response to Interrogatory No. 4, docket #50-16.

27. Paige further determined that several USB devices, including a Western Digital 1TB USB external storage device, were connected to Defendant's Compaq Presario. Paige Declaration, ¶¶ 57-58. However, these devices were neither disclosed nor produced to the Plaintiff. *See* Plaintiff's Response to Interrogatory No. 4, docket #50-16.

28. The BitTorrent client "uTorrent" was once installed and operational on Defendant's Compaq Presario, and a search for the term "uTorrent" yielded over 3400 search results. Paige Declaration, ¶ 46. Notably, uTorrent is the same BitTorrent client that was used to access the Plaintiff's above-listed films. *See* Excel Spreadsheet Containing MySQL Data, docket #50-7.

29. Defendant identified himself and Mary Catherine Skokan as the only two authorized users of his computer, and identified himself as the primary user. *See* Plaintiff's Response to Interrogatory No. 4, docket #50-16.

30. Ms. Skokan and Defendant both had User Accounts on Defendant's computer titled, "Mary,"

"Justin," and "Justin.EBBY." Paige Report, at 2, docket #50-9 at 14. However, uTorrent was installed on, and X-Art hit results were found in, the "Justin.EBBY" account, and the X-Art files on the "F" drive were accessed by the "Justin" account. *Id.* at 15-16.

31.     Defendant's computer hard drive also contained the programs CCleaner and Eraser 6. Paige Declaration, ¶¶ 59-68; *see also* Paige Report, docket #50-9 at 20. Defendant tried to use the Eraser 6 program to delete the recycling bin for the "F" drive that he did not produce. Paige Report, docket #50-10 at 1. The earliest date of the Eraser 6's installation was July 17, 2014. *Id.* at 20.

### III.   Procedural History

Plaintiff initiated this action on December 12, 2013 alleging that a John Doe Defendant, identified only by an Internet Protocol ("IP") address, had infringed on Plaintiff's copyrighted works by using the internet and a "BitTorrent" protocol to reproduce, distribute, display, or perform Plaintiff's protected film. Complaint, docket #1. Plaintiff was granted permission from the Court to serve limited, immediate discovery on the Doe Defendant's Internet Service Provider ("ISP") prior to the Rule 26(f) conference for the purpose of obtaining additional information concerning the identity of the Doe Defendants. Docket #9. After receiving such information, the Plaintiff filed an Amended Complaint naming Justin Winkler as the Defendant in this case. Docket #12. Plaintiff served Defendant with a summons and the Amended Complaint on May 3, 2014. Docket #20. Defendant filed an Answer to the Amended Complaint on June 27, 2014. Docket #31.

Following discovery on these claims, Plaintiff timely filed the present motion for summary judgment arguing no material facts are in dispute as to whether Defendant copied the above-listed films without permission and in violation of the Copyright Act. Although ordered to respond on or before June 11, 2015 (docket #52), the Defendant has not, to date, filed a response to the present

motion and has not requested an extension of time within which to do so.

## **LEGAL STANDARDS**

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;

the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and ... if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## **ANALYSIS**

Here, the Defendant failed to file a timely response to the present motion although provided ample time within which to do so. However, even if the Defendant fails to present evidence demonstrating an issue of material fact in response to the summary judgment motion, the Plaintiff still bears the burden of demonstrating it is entitled to summary judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. "Accordingly, summary judgment is 'appropriate' under Rule 56(e) only when the moving party has met its initial burden of production under Rule 56(c)." *Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1200 (10th Cir. 2002). "If the evidence produced in support of the summary judgment motion does not meet this burden, summary judgment must be denied even if no opposing evidentiary matter is presented." *Id.* (internal quotation marks and citation omitted). "If the nonmoving party fails to respond, the district court may not grant the

motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Id.*

To meet its burden of production required to support summary judgment, the Plaintiff "need only point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 674 (10th Cir. 2002) (citation omitted). "Summary judgment will then lie if the movant establishes entitlement to judgment as a matter of law given [the] uncontroverted, operative facts." *Id.* Irrelevant or unnecessary factual disputes will not be considered. *Id.*

Here, the Plaintiff must demonstrate the absence of factual issues as to the two elements necessary to prove a copyright infringement claim: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991)). "A plaintiff's presentation of a certificate of registration from the U.S. Copyright Office usually constitutes prima facie evidence of a valid copyright and of the facts stated in the certificate." *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005) (citing 17 U.S.C. § 410(c)). "Upon presentation of such a certificate, the defendant bears the burden to overcome the presumption of validity." *Id.* (citing *Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1487 (10th Cir.1993)). In this case, Plaintiff provides evidence that it owns the copyrights to each of the films listed above in the form of reports from the United States Copyright Office Public Catalog demonstrating that Malibu Media LLC is the "copyright claimant"

for each of the listed films. *See* Public Catalog, docket #50-3.[2] Defendant did not respond and, thus, does not meet his burden to overcome the presumption of the reports' validity.

For the second element, Plaintiff must prove that Defendant "unlawfully appropriated protected portions of the copyrighted work." *La Resolana Architects*, 555 F.3d at 1178 (quoting *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823, 832 (10th Cir. 1993)). "This requires proving both: (1) that Defendant, as a factual matter, copied portions of Plaintiff's work; and (2) that those elements of the work that were copied were 'protected expression and of such importance to the copied work that the appropriation is actionable.'" *Id.*; *see also Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 942 (10th Cir. 2002).

"A plaintiff can indirectly prove copying (in a factual sense) 'by establishing that a defendant had access to the copyrighted work and that there are probative similarities between the copyrighted material and the allegedly copied material.'" *La Resolana Architects*, 555 F.3d at 1178 (quoting *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1284 (10th Cir. 1996)). "A plaintiff may meet the initial burden of establishing access 'by showing that the defendant had a reasonable opportunity to view or [an] opportunity to copy the allegedly infringed work.'" *Id.* (quoting *Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.,* 994 F.2d 1476, 1490 (10th Cir. 1993)). "Thus, while a plaintiff is not required to demonstrate the defendant's actual access to the work, 'evidence that only creates a bare possibility that the defendant had access is not sufficient.'" *Id.* (quoting *Mag Jewelry Co. v. Cherokee, Inc.,* 496 F.3d 108, 117 (1st Cir. 2007)).

---

[2]The Court notes that the text in the copy of the report for the film, "Almost Famous," is partially missing, due likely to a copying error; however, the Court can make out the registration number for the film as well as that Malibu Media, LLC is the owner of the film. Docket #50-3 at 27.

Once copying has been established, "liability for copyright infringement will attach only where protected elements of a copyrighted work are copied." *Id.* at 1180 (quoting *Country Kids 'N City Slicks, Inc.,* 77 F.3d at 1284). "The plaintiff must prove that there is a 'substantial similarity between those aspects of Plaintiff's [work] which are legally protectable and the Defendants' [work].'" *Id.* Substantial similarity is measured by whether an "ordinary observer," who is not specifically looking for disparities, would tend to overlook any differences between the works. *Id.* "Substantial similarity" is not an element of a copyright claim but, rather, a "doctrine that helps courts adjudicate whether copying of the 'constituent elements of the work that are original' actually occurred when an allegedly infringing work appropriates elements of an original without reproducing it *in toto*." *Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1154 (9th Cir. 2012) (citation omitted).

Although Plaintiff appears to argue that it has demonstrated *direct* proof that Defendant copied its films, it is unclear whether the evidence demonstrates that the entirety of each film was copied onto Defendant's computer. That is, Mr. Patzer (who designed, implemented, maintained and monitored the data collection system used to identify IP addresses that have allegedly committed infringement via the BitTorrent protocol) attests that

> 16. Data sent through the internet is delivered in the form of "packets" of information. PCAP stands for "Packet Capture." A PCAP is a computer file containing captured or recorded data transmitted between two computers. A "Packet Analyzer" records packets of data being transmitted between two computers over a network, such as the internet, and saves it in a PCAP. Packet analyzers also enable users to read and analyze PCAPs. PCAPs are akin to videotapes, but instead of recording light and sound they record zeroes and ones.
> ...
> 19. Here, the PCAPs are recordings of numerous BitTorrent computer transactions during which a person using Defendant's IP Address sent pieces of an infringing computer file (which contain an unlawful copy of Plaintiff s works) to Excipio's

>servers. I personally maintain and monitor the servers.
>
>20. Each PCAP clearly shows the IP address distributing the BitTorrent piece (Defendants IP address), the IP address receiving the BitTorrent piece (Excipio's IP address), what was transmitted (a piece of Malibu Media's copyrighted movie(s)), the transaction protocol (i.e. BitTorrent), and the time of the infringing transaction.
>...
>
>27. Only 1 PCAP per movie infringed is produced to the Plaintiff usually. 1 PCAP per movie is sufficient to prove without question that the infringement of each of the movies at issue occurred. Producing all PCAPs for each of the infringed movies would be superfluous and extremely time consuming.

Patzer Declaration, docket #50-7. Accordingly, the PCAPs at issue here contain "pieces" of the Plaintiff's movies. Mr. Patzer does not explain why *one* PCAP is "sufficient to prove" Defendant copied the entire film and why producing all PCAPs would be superfluous.

Accordingly, the Court looks to whether Plaintiff can prove copying *indirectly* "'by establishing that [Defendant] had access to the copyrighted work and that there are probative similarities between the copyrighted material and the allegedly copied material.'" *La Resolana Architects*, 555 F.3d at 1178. First, the Court recommends the District Court find Plaintiff has demonstrated no genuine issue of material fact exists as to whether Defendant had access to its films. The evidence shows that Plaintiff's investigator, IPP, while scanning the BitTorrent file distribution network, established a connection with a computer using IP address 67.165.232.125; Comcast confirmed that the IP Address belonged to Defendant; Defendant's computer was password protected; the BitTorrent client "uTorrent" was once installed and operational on Defendant's computer, and a search for the term "uTorrent" yielded over 3400 search results; uTorrent is the same BitTorrent client that was used to access the Plaintiff's above-listed films; and IPP recorded Defendant's IP Address engage in 433 transactions or "hits" of Plaintiff's copyrighted movies. Defendant does not dispute these facts; thus, the first prong is satisfied.

Second, the Court recommends the District Court find substantial similarities between 28 of the Plaintiff's above-listed films and files copied onto Defendant's hard drive. The evidence reflects that Plaintiff's expert, Paige, conducted a key word search of the 84 X-Art filenames identified on the investigator's list of BitTorrent transactions and found that 44 of the X-Art filenames identified on the list once existed on Defendant's computer; Paige then conducted a search of the torrent filenames for each of Plaintiff's above-listed films and found that, of Plaintiff's 39 films at issue in this case, at least 28 of the films once existed on Defendant's computer.[3] Defendant does not dispute this evidence.[4]

Plaintiff argues that the Court should grant summary judgment on its claim that Defendant infringed the remaining 11 films because the Fifth Circuit has found infringement even where the works were not found on the defendant's hard drives, and because Defendant failed to produce all of his hard drives for examination and attempted to destroy evidence on his hard drive.

---

[3] Those films include: "Almost Famous," "Alone is a Dream Left Behind," "Black and White," "Blindfold Me Part II," "Body Language," "Burning," "Come from Behind," "Dangerous Game," "Date Night at Home," "First and Forever," "Green Eyes," "I Love James Deen," "Lovers at Home," "Make Me Feel Beautiful," "Meet Me in Madrid," "My Naughty Girl," "Oh Mia," "Pretty Backdoor Baby," "Raw Passion," "Red Satin," "Spontaneous," "Stay for a While," "The Young and the Restless," "Through the Looking Glass," "Tuesday Morning," "Up Close and Personal," "We Love Ourselves," and "Without Words." Paige Declaration, ¶ 52, docket #50-9; Paige Report, docket #50-9 at 17-18.

[4] The Court's findings are in line with the findings of other courts ruling on similar evidence presented by the Plaintiff in support of summary judgment motions. *See Malibu Media v. Harrison*, No. 12-cv-1117-WTL, 2015 WL 3545250, at *3 (S.D. Ind. June 8, 2015) (analyzing what appears to be nearly identical evidence, the court found "Malibu Media has also produced evidence from which a reasonable jury could conclude that [defendant] copied the six movies at issue using BitTorrent."); *see also Malibu Media v. Doe*, -- F.3d --, 2015 WL 412855, at *6 (E.D. Pa. Feb. 2, 2015) (where the defendant's hard drive contained only a "snippet" of a preview of one of Malibu Media's 14 films at issue and the defendant testified that he had never used any form of BitTorrent, the court denied summary judgment).

17

First, the Court finds the facts underlying the Fifth Circuit's opinion in *Maverick Recording Co. v. Harper*, 598 F.3d 193, 195-96 (5th Cir. 2010), are distinguishable. In *Harper*, the court found that although 16 contested audio files were not found on the defendant's hard drive, there was "voluminous and undisputed evidence that she downloaded and shared" the files, as determined from the computer expert's investigation of the defendant's "shared folder." *Id.* at 196. Plaintiff proffers no such evidence that its expert found the Defendant had shared the 11 films or otherwise located the films on Defendant's computer.

Second, while spoliation of evidence can certainly raise an adverse inference against a party, *see Henning v. Union Pacific R.R. Co.*, 530 F.3d 1206, 1219-20 (10th Cir. 2008) ("[a]n adverse inference is a powerful sanction as it brands one party as a bad actor and necessarily opens the door to a certain degree of speculation by the jury, which is admonished that it may infer the presence of damaging information in the unknown contents of an erased audiotape.") (internal quotations and citation omitted), such inference itself is insufficient to demonstrate no genuine issue of material fact for purposes of this motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) *(*in ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Consequently, because there is no evidence that the remaining 11 films were copied onto the Defendant's computer, this Court recommends finding that Plaintiff fails to establish no genuine issue of material fact as to whether Defendant illegally copied these films.

## CONCLUSION

In sum, the Court finds that Plaintiff has properly established no genuine issue of material fact that the Defendant copied 28 of the 39 films at issue in violation of the Copyright Act.

However, Plaintiff has failed to establish no factual issues as to whether Defendant illegally copied the remaining 11 films.

Accordingly, based upon the foregoing and the entire record herein, this Court respectfully RECOMMENDS that Plaintiff's Motion for Summary Judgment [filed May 15, 2015; docket #50] be **GRANTED IN PART AND DENIED IN PART**.

Submitted and dated at Denver, Colorado, this 24th day of June, 2015.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge